Slip Op. 07-60

UNITED STATES COURT OF INTERNATIONAL TRADE

MITTAL STEEL POINT LISAS LTD.,

         Plaintiff,

     v.

UNITED STATES

         Defendant,

GERDAU AMERISTEEL CORP. AND
KEYSTONE CONSOLIDATED INDUSTRIES,
INC.

         Defendant-
            Intervenors.

BEFORE: Pogue, Judge

Court No. 05-00681
**Public Version**

[Commerce's determination **affirmed-in-part** and **remanded-in-part**
and Plaintiff's Motion for Judgment on the Agency Record **denied**]

Decided: April 24, 2007

Steptoe & Johnson LLP (Eric C. Emerson, Evangeline D. Keenan,
Michael A. Pass) for Plaintiffs.

Peter D. Keisler, Assistant Attorney General; Jeanne E. Davidson,
Director, Patricia M. McCarthy, Assistant Director, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice
(Michael D. Panzera, Trial Attorney) for Defendant.

Kelley Drye Collier Shannon (Paul C. Rosenthal, Mary T. Staley)
for Defendant-Intervenors.

### OPINION

**Pogue, Judge:** In this action, Plaintiff Mittal Steel Point

Lisas Ltd. ("Mittal" or "Plaintiff") seeks review of the final

results of the second administrative review of the antidumping duty

order on Carbon and Certain Alloy Steel Wire Rod from Trinidad &

Tobago and the antidumping duty rate thereby imposed by the Department of Commerce ("Commerce"). Specifically, Plaintiff challenges (1) Commerce's decision to treat certain wire rod as non-prime merchandise, thereby excluding the foreign sales thereof from its calculation of fair or normal value ("NV") in Mittal's home market, and (2) Commerce's calculation of Mittal's constructed export price (CEP) for Mittal's U.S. sales, particularly the deduction of credit expenses for the time period between shipment from the port in Trinidad & Tobago and the date payment was received.

Pending before the court is Plaintiff's USCIT R. 56.2 motion for judgment on the agency record. For the reasons stated herein, Commerce's determination regarding prime versus non-prime merchandise is affirmed, Commerce's Consent Motion for Partial Voluntary Remand is granted so that Commerce may make further findings regarding Mittal's CEP consistent with this opinion, and Plaintiff's Motion for Judgment on the Agency Record is denied.

## Background

Mittal manufactures steel wire rod in Trinidad & Tobago, and sells such steel wire rod in its home market. Together with its North American affiliate and importer, Mittal Steel North America ("MSNA"),[1] Mittal also sells steel wire rod for export to the

---

[1]Mittal was formerly known as Caribbean Ispat Ltd.; MSNA was formerly known as Ispat North America Inc.

United States.

Following an investigation of Mittal's sales, Commerce published an antidumping duty order on steel wire rod from Trinidad & Tobago in 2002. See Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico, Moldova, Trinidad & Tobago, and Ukraine, 67 Fed. Reg. 65,945 (Dep't Commerce Oct. 29, 2002)(notice of antidumping duty orders).[2]

In due course, on November 16, 2005, Commerce published the final results of Mittal's second administrative review,[3] which Mittal challenges in this case, see Carbon and Certain Alloy Steel

---

[2]To calculate dumping margins, Commerce "compares the 'U.S. Price' to the 'normal value' of the subject merchandise and imposes anti-dumping duties if, and to the extent, the former is lower than the latter." AK Steel Corp. v. United States, 226 F.3d 1361, 1364 (Fed. Cir. 2000).

[3]"[T]he United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported." 19 C.F.R. § 351.212(a)(2005); see also Hebei New Donghua Amino Acid Co. v. United States, 29 CIT __, __, 374 F. Supp. 2d 1333, 1339 (2005). When the investigation is complete, Commerce issues a final determination and, where appropriate, an antidumping duty order. See Decca Hospitality Furnishings, LLC v. United States, 30 CIT __, __, 427 F. Supp. 2d 1249, 1251 (2006); see also Am. Signature, Inc. v. United States, 31 CIT __, Slip. Op. 07-20 at 2-3 (Feb. 14, 2007).
Generally, the actual liability faced by the importers is established through the process of an "administrative review". See 19 C.F.R. § 351.213(a)(2005) ("Although duty liability may be determined in the context of other types of reviews, the most frequently used procedure for determining final duty liability is administrative review procedure under section 751(a)(1) of the Act."); see also Mukand Int'l, Ltd. v. United States, Appeal No. 06-1259 at 2-3 (Fed. Cir. Feb. 6, 2007); see also Am. Signature, Inc., 31 CIT __, Slip. Op. 07-20 at 3-6.

Wire Rod from Trinidad & Tobago, 70 Fed. Red. 69,512 (Dep't Commerce Nov. 16, 2005)(notice of final results of antidumping duty administrative review)("Final Results"). These final results adopt and incorporate Commerce's Issues and Decision Memorandum. Memorandum to Joseph A. Spetrini from Stephen J. Claeys, Issues and Decisions for the Final Results of the Second Administrative Review of the Antidumping Duty Order on Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago, (Dep't Commerce Nov. 16, 2005), P.R. Doc. 62, available at http://ia.ita.doc.gov/frn/summary/trinidad/E5-6331-1.pdf ("Decisions Mem.").[4]

    1. Production of prime wire rod

    In its products' price lists for customers in both Trinidad & Tobago and the United States, Mittal designates certain steel wire rod as "prime." At the same time, Mittal also sells another steel wire rod product exclusively in Trinidad & Tobago that it designates in its price lists as "composite wire." See, e.g., Letter from Eric C. Emerson to the Hon. Carlos Gutierrez Administrative Review of Antidumping Duty Order on Carbon and Certain Alloy Steel Wire Rod from Trinidad & Tobago: Caribbean Ispat Limited Response to Section A, B, C, and D Questionnaires

_____

    [4]The explanation of Commerce's analysis of Mittal's steel wire rod sales can be found in the Issues and Decision memorandum.

(Jan. 31, 2005), P.R. Doc. 16, C.R. Doc. 5 at 270, 283, Attachs.
A.13, A.14 ("Questionnaire Response").

Commerce classifies Mittal's composite wire as non-prime
merchandise, a decision Mittal challenges in this action.  At the
same time, the description of the production process for composite
wire is not contested here.  That process, however, and its
differences from the production process for "prime"[5] wire rod, and
the resultant price difference between the two types of
merchandise, are relevant to a review of Commerce's decision to
treat composite wire as non-prime merchandise.  In sum, the
production process for composite wire produces a physical, though
not chemical, difference in the resultant wire rod, and the
physical difference provides a basis for the difference in price
between prime wire rod and composite wire rod.[6]

---

[5]Though the court uses the term "prime" in referring to wire
rod, it does not presuppose Commerce's decision to treat that
merchandise as "prime merchandise" to be correct.  The
nomenclature is meant to distinguish "prime" wire rod from
"composite" wire rod, regardless of the category of merchandise
into which it should fall.

[6][

In its investigation of Mittal's sales, Commerce determined that composite wire was not prime merchandise, and therefore Commerce excluded sales of composite wire in calculating the normal value of subject merchandise in the home country. In so doing, Commerce relied on Mittal's price list, which distinguished between "Prime Wire Rods and Rebars" and "Composite (Wire Rods)." See Decisions Mem. at 9 (Cmt. 4) ("we did not use the wire rod which was not identified as prime on [Mittal's] price list for matching purposes"); see also Questionnaire Response P.R. Doc. 16, C.R. Doc. 5 at 270, 283, attachs. A.13, A.14.

2. Calculation of Constructed Export Price

During the administrative review at issue here, Mittal reported its sales of wire rod to unaffiliated U.S. customers through MSNA. Both Commerce and Mittal considered these sales to qualify as constructed export price ("CEP") sales under section 772(b) of the Act.[7] See   See Decisions Mem. Mittal made these

---

[6](...continued)

]

[7]When an arm's-length transaction takes place between a foreign producer and an independent importer, U.S. price is calculated using the statutory Export Price (EP) provision; CEP
(continued...)

CEP sales to U.S. customers and shipped the merchandise to MSNA, which unloaded it and arranged for its delivery to the U.S. customers. Id. at 23-24, 245, attach. A.8.    During the investigation, Mittal reported its expenses associated with making these sales, as well as those expenses associated with making sales in Trinidad & Tobago, for the purposes of adjusting CEP and NV. See Id. at 785-86, attach. B.14.[8]  Specifically, in response to questionnaires, Mittal reported foreign inventory carrying costs, U.S. inventory carrying costs, and imputed credit expenses as information which provided a basis for price adjustments. Id.; see also Br. Supp. Pl.'s Mot. J. Agency. R. at 15 ("Pl.'s Br.").

In reporting its imputed credit expenses for sales in the U.S., Mittal calculated the credit expense for a period commencing on the date Mittal invoiced the goods to the U.S. customer and ending on the date Mittal received payment.    Pl.'s Br. 15. Commerce recalculated Mittal's reported direct credit expenses and

---

[7](...continued)
is used when the foreign producer and the importer are affiliated. See, e.g., Smith-Corona Group v. United States, 713 F.2d 1568, 1572 (Fed. Cir. 1983)("Where the importer is an unrelated, independent party, purchase price is used . . . . Where the importer is related, an arm's length transaction does not occur until the goods are resold to a retailer or to  the public."); see also PQ Corp. v. United States, 11 CIT 53, 58-59, 652 F. Supp. 724,730 (1987).  Exceptions to this rule are detailed in AK Steel Corp., 226 F.3d at 1365.

[8]The statute provides for certain adjustments to CEP and NV so that an "apples-to-apples" comparison can be made. See infra p. 14.

inventory carrying costs, considering the reported expenses to be inaccurate. <u>Decisions Mem.</u> at 4 (Cmt. 2).  Commerce determined that Mittal's goods had not been warehoused in a bonded warehouse in the United States, and thus set to zero the U.S. inventory carrying costs reported by Mittal, reasoning that in the absence of warehousing in the United States, MSNA did not incur such inventory carrying costs.  Commerce also recalculated credit expenses to begin accruing on the date of shipment from the foreign port. In so doing, Commerce stated that "[c]redit expense is the interest expense incurred . . . between date of shipment of merchandise to a customer and date of receipt of payment from the customer." <u>Id.</u>

## Jurisdiction and Standard of Review

This action is brought under 19 U.S.C. § 1516a.[9]  Section 1677(9) grants Plaintiff standing to bring the action as an interested party that participated in the administrative proceedings below.  19 U.S.C. § 1677(9).  The court has jurisdiction over the action pursuant to 28 U.S.C. § 1581(b).

The court's review is to determine whether Commerce's determinations, findings, or conclusions are supported by substantial evidence on the record, and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## Analysis

---

[9]All references to the United States Code are to the 2000 edition.

1. <u>Treatment of composite wire rod as non-prime merchandise</u>

To identify the appropriate foreign like product for the purpose of determining NV of the subject merchandise, the Statute dictates that Commerce may first use data about "[t]he subject merchandise and other merchandise which is <u>identical</u> in physical characteristics with, and was produced in the same country by the same person as, that merchandise." 19 U.S.C. § 1677(16)(A)(emphasis added).[10]  Where non-prime merchandise is sold in the United States, Commerce matches it to non-prime merchandise sold abroad. <u>Corus Staal BV v. United States Dep't of Commerce</u>, 27 CIT 388, 405, 259 F. Supp. 2d 1253, 1268 (2003); <u>see also Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea</u>, 71 Fed. Reg. 7,513 (Dep't Commerce Feb. 13, 2006)(notice of final results of the eleventh administrative review), Mem. to David M. Spooner, Assistant Secretary, Import Administration from Stephen J. Claeys, Re: <u>Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea</u> (Issues and Decisions for the Final Results of the 11th Admin. Review) at 23 (Cmt. 13), <u>available at</u> http://ia.ita.doc.gov/frn/summary/korea-south/E6-1984-1.pdf (excluding home market sales of non-prime merchandise from

---

[10]This section also permits the use of other categories of data for this determination.  Because the parties do not contest that data in this first category of "identical" merchandise are available, the court does not discuss the remainder of the provision.

calculations where there were no sales of non-prime merchandise in the United States).

In this case, Commerce has interpreted the ambiguous term "identical" in making its determination. Specifically, Commerce has determined that rod labeled "composite wire rod" is not identical to "prime wire rod." The Court of Appeals for the Federal Circuit has held that in section 1677(16)(A), Congress meant for "identical" to mean "closely alike or equivalent, rather than 'being the same' or 'exactly equal and alike.'" Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1383 (Fed. Cir. 2001). The Federal Circuit found the term "identical" ambiguous, and, reviewing Commerce's interpretation, found it to be a reasonable interpretation, where "Commerce [] concluded that merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant." Id. at 1384; see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 845 (1984)(agency's interpretation of an ambiguous term in statute reviewed for reasonableness). Thus, slight physical differences need not preclude merchandise from being considered prime merchandise. In Pesquera Mares, however, the differences "were not commercially significant." Pesquera Mares, 266 F.3d at 1384.

Faced with this legal landscape, Mittal argues that Commerce's

treatment of composite wire rod as non-prime is inconsistent with
prior agency practice. <u>Pl.'s Br.</u> 10.  Mittal points to a previous
Commerce determination treating as prime merchandise rolls of film
that had a minor, physical difference from other "prime"
merchandise. <u>Certain Polyethylene Terephthalate Film, Sheet and
Strip from India</u>, 70 Fed. Reg. 8072 (Dep't Commerce Feb. 17, 2005)
(final results of antidumping duty administrative review)("<u>PET
Film</u>").  In <u>PET Film</u>, Commerce stated that the "sole reason for
considering shorter rolls of PET film to be non-prime merchandise
is that these rolls cannot be used by customers in normal
production runs; hence, buyers consider shorter rolls of PET film
to be less valuable than full rolls of PET film." <u>PET Film</u>, Mem. to
Joseph A. Spetrini, Acting Assistant Secretary, Import
Administration from Barbara E. Tillman Re: <u>Certain Polyethylene
Terephthalate Film, Sheet and Strip from India</u> (Issues and Decision
Memorandum for the 2001-2003 Administrative Review), at 21-22 (Cmt.
5) <u>available at</u> http://ia.ita.doc.gov/frn/summary/india/E5-658-
1.pdf.  Yet, Commerce treated the shorter rolls as prime
merchandise. <u>Id.</u>  Thus, Mittal argues, where there is only one,
minor physical difference[11] between prime wire rod and composite
wire rod, composite wire rod should be considered prime

---

[11] [

]

merchandise.

     Mittal fails to take into account the next sentence in
Commerce's <u>PET Film</u> decision, i.e., Commerce found "no evidence on
the record . . . that Jindal America consistently sold shorter
rolls of PET film <u>at prices lower than that charged for full rolls</u>
<u>of identical PET film</u> . . . ." <u>Id.</u> (emphasis added).  In other
words, in <u>PET Film</u>, the physical difference was slight enough that
the merchandise could be considered identical because that
difference did not result in a price difference. Presumably, such
a price difference would distort the comparison of NV and CEP. <u>See,</u>
<u>e.g.,</u> <u>Certain Polyethylene Terephthalate Film, Sheet and Strip from</u>
<u>India</u>, 71 Fed. Reg. 47,485 (Dep't Commerce Aug. 17, 2006)(final
results of antidumping duty administrative review), Mem. to David
M. Spooner, Assistant Secretary, Import Administration from Stephen
J. Claeys Re: <u>Certain Polyethylene Terephthalate Film, Sheet and</u>
<u>Strip from India</u> (Issues & Decision Mem. for the Final Results of
the Administrative Review of the Antidumping Duty Order) at 5 (Cmt.
4) <u>available at</u> http://ia.ita.doc.gov/frn/summary/india/E6-13592-
1.pdf ("[g]iven the difference in the physical characteristics
between prime and non-prime merchandise . . . and the potential
distortion resulting from comparing sales of prime merchandise in
the U.S. market to sales of non-prime merchandise sold in India, we
continue to find that it was appropriate for [Commerce] to
distinguish between [] sales of prime and non-prime merchandise.").

A distinction based on both the degree of physical difference and price difference follows the logic set forth in Pesquera Mares as well, that "identical" need not mean "exactly equal and alike" in cases where the differences are not commercially significant. Pesquera Mares, 266 F.3d at 1384; see also Stainless Steel Wire Rod from Korea 63 Fed. Reg. 40,404, 40,414 (Gen'l Cmt. 7)(Dep't Commerce July 29, 1998)(notice of final determination of sales at less than fair value)(finding that both "prime 1" and "prime 2" products should be considered as prime because "[Commerce] found no physical differences between the two prime products that would lead [it] to believe that prime 1 and prime 2 products are not comparable in price or cost.")

Here, there is evidence on the record that the physical difference between prime and composite wire was commercially significant.   Namely, as Mittal reports, there was a price difference between prime wire rod and composite wire rod.   Pl.'s Br. 8-9.  This price difference, according to Mittal, was due to composite rod having a physical difference from prime wire rod, which is "the only physical distinction between composite rod and other prime rod". Id. at 9.

This evidence, which is attested to by Mittal, is adequate to support the conclusion that composite wire rod is not "identical" to prime wire rod, and should therefore not be considered prime merchandise.   Nor has Commerce applied the term inconsistently,

because, in <u>PET Film</u>, the slight physical difference was not commercially significant.  The court therefore affirms Commerce's decision to treat composite wire rod as non-prime merchandise.

2. <u>Calculation of Inventory Carrying Costs and Credit Expenses</u>

In cases where goods are sold in the U.S. through an affiliated company, the "U.S. Price" is constructed using the first sale to an unaffiliated entity.  See <u>U.S. Steel Group v. United States</u>, 22 CIT 670, 15 F. Supp. 2d 892 (1998)(analyzing situations in which U.S. affiliate has sufficient involvement in a sale that use of CEP, rather than EP, is appropriate), rev'd and remanded on other grounds in <u>U.S. Steel Group v. United States</u>, 225 F.3d 1284 (Fed. Cir. 2000).  Adjustments are made to NV and EP or CEP so that an "apples-to-apples" comparison can be made, at a "specific, 'common' point in the chain of commerce, so that value can be fairly compared on an equivalent basis." <u>Micron Technology, Inc. v. United States</u>, 243 F.3d 1301, 1303, 1313 (Fed. Cir. 2001)(citing <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1568 (Fed. Cir. 1994)).[12]  However, "[i]f the sale is classified as a CEP sale, additional deductions are taken from the sales price to arrive at the U.S. Price." <u>AK Steel Corp.</u>, 226 F.3d at 1364.  This is because affiliated companies could manipulate their books to

---

[12]Adjustments to NV are detailed in 19 U.S.C. § 1677b(a)(6); adjustments to EP and CEP are detailed in 19 U.S.C. § 1677a(c).

escape a determination of dumping:

> [t]he risk is that an artificially low price
> may be charged to the affiliated distributor
> in the home market and an artificially high
> price charged to the affiliated distributor in
> the United States market. The consequence in
> each case is that a lower countervailing duty
> (or no duty at all) would be payable.

<u>Micron Technology</u>, 243 F.3d at 1303.

The additional deductions from CEP are set out in 19 U.S.C.
§ 1677a(d), and include costs of sale, such as "expenses that
result from, and bear a direct relationship to, the sale, such as
credit expenses, guarantees and warranties." 19 U.S.C.
§ 1677a(d)(1)(B).[13] The purpose of these additional adjustments to

---

[13]The full text of the provision is:
Additional adjustments to constructed export price
For purposes of this section, the price used to
establish constructed export price shall also be
reduced by--
(1) the amount of any of the following expenses
generally incurred by or for the account of the
producer or exporter, or the affiliated seller in the
United States, in selling the subject merchandise (or
subject merchandise to which value has been added)--
(A) commissions for selling the subject merchandise in
the United States;
(B) expenses that result from, and bear a direct
relationship to, the sale, <u>such as credit expenses</u>,
guarantees and warranties;
(C) any selling expenses that the seller pays on behalf
of the purchaser; and
(D) any selling expenses not deducted under
subparagraph (A), (B), or(C);
(2) the cost of any further manufacture or assembly
(including additional material and labor), except in
circumstances described in subsection (e) of this
section; and

(continued...)

the CEP is "to prevent foreign producers from competing unfairly in the United States market by inflating the U.S. price with amounts spent by the U.S. affiliate on marketing and selling the products in the United States."  <u>AK Steel Corp.</u>, 226 F.3d at 1367.

The deductions at issue in this case include both inventory carrying costs, which represent the cost of keeping a product in inventory until it is sold, and credit expenses, which represent the opportunity cost of money owed to the producer between the date of sale and the date payment is received.

The date that merchandise is considered to be shipped to the customer is significant in determining how long the carrying costs were borne by the seller, while the date of sale is significant in determining the starting point of the period for which credit expenses are calculated.  As discussed further, below, the date the merchandise is shipped to the customer is sometimes taken as the date of sale.  A later date of sale results in smaller deductions from the CEP for credit expenses, although it can increase the period during which carrying costs are incurred.

Whether goods are shipped to the unaffiliated customers directly from the foreign port or whether they are warehoused in the United States is important to the determination of when credit

---

[13](...continued)
 (3) the profit allocated to the expenses described in
paragraphs (1) and (2).
19 U.S.C. § 1677a(d). (emphasis added).

expenses begin accruing, and whether there are U.S. carrying costs.
If goods are warehoused in the U.S., the date of sale will not
occur until after the merchandise is in the United States, <u>Brake
Drums and Brake Rotors from the People's Republic of China</u>, 61 Fed.
Reg. 53,190, 53,195 (Dep't Commerce Oct. 10, 1996)(notice of
preliminary determinations of sales at less than fair value and
postponement of final determinations), and thus the clock for
credit expenses won't start running until then.

A. <u>Credit Expenses</u>

As noted above, credit expenses are the costs associated with
money being owed to the seller after it has sold its merchandise to
the customer but has not been paid.  Determining the date of sale
of the merchandise is therefore critical to calculating this cost.
In its regulations, Commerce states that:

> [i]n identifying the date of sale. . . the Secretary
> normally will use the date of invoice . . . . However,
> the Secretary may use a date other than the date of
> invoice if the Secretary is satisfied that a different
> date better reflects the date on which the exporter or
> producer establishes the material terms of sale.

19 C.F.R. § 351.401(i)(2005).  The use of a uniform date of sale
(namely, the date of invoice) is to achieve both efficiency and
predictability.  Preamble to the Dept.'s Final Regs. at 19 C.F.R.
parts 351, 353 and 355, 62 Fed. Reg. 27,296, 27,348 (Dep't Commerce
May 19, 1997)(final rule)("<u>Preamble</u>").  Also in this Preamble to
Commerce's regulations, in rejecting suggestions that it use the

date of shipment rather than the date of invoice as the date of

sale, Commerce gave the following reasons:

> First, date of shipment is not among the possible dates
> of sale specified in note 8 of the AD Agreement. Second,
> based on the Department's experience, date of shipment
> rarely represents the date on which the material terms of
> sale are established. Third, unlike invoices, which can
> usually be tied to a company's books and records, firms
> rarely use shipment documents as the basis for
> preparation of financial reports. Thus, reliance on date
> of shipment would make verification more difficult.

Id. at 27,349. Commerce thereby states that the date of shipment

should not normally be used as the date of sale, and that the date

of sale determination depends on the date when material terms of

sale are established. Nevertheless, it is Commerce's practice to

use the date of shipment as the date of sale when the date of

invoice is after the date of shipment. See, e.g., Certain Hot-

Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 64

Fed. Reg. 38,756, 38,768 (Dep't Commerce July 19, 1999)(notice of

final determination of sales at less than fair value)("The

Department does not consider dates subsequent to the date of

shipment from the factory as appropriate for date of

sale.")(emphasis in original)("Steel Products from Brazil"); see

also Stainless Steel Bar from Japan 65 Fed. Reg. 13,717 (Dep't

Commerce Mar. 14, 2000)(final results of antidumping administrative

review), Mem. to Robert S. LaRussa, Assistant Secretary, Import

Administration from Richard W. Moreland Re: Issues and Decisions

Mem. For the Administrative Review of Stainless Steel Bar from

J a p a n   ( C m t .   1 ) a v a i l a b l e   a t http://ia.ita.doc.gov/frn/summary/japan/00-6264-1.txt ("In keeping with the Department's practice, the date of sale cannot occur after the date of shipment"). In Steel Products from Brazil, Commerce explained that "[t]he Department considers the date of sale to be the date on which all substantive terms of sale are agreed upon by the parties." Steel Products from Brazil, 64 Fed. Reg. at 38,768. The reason for Commerce's practice regarding the use of date of shipment is that when a party ships its product to a customer, it is reasonable to assume that the material terms of the sale have been established. Id. Thus, Commerce has adopted a practice of calculating the date of sale to be the date of invoice, unless the date of shipment is earlier. This is in contradiction to Commerce's statement in the preamble that "date of shipment rarely represents the date on which the material terms of sale are established." Preamble, 62 Fed. Reg. at 27,349. Nonetheless, using the date of shipment when that date is before the invoice date is a practice the Department has adhered to in other investigations, and which has been implicitly approved by the courts. See AIMCOR v. United States., 141 F.3d 1098, 1104-05 (Fed. Cir. 1998)(citing AIMCOR v. United States, 19 CIT 966, 972 (1995) ("Commerce's established practice is to calculate credit expenses from the date of shipment to the date payment is received from the customer.")). Commerce's reasoning therefore seems to be that shipment to the

customer does not occur before the material terms of sale have been determined, so that when invoicing is subsequent to shipment, the date of shipment is generally an appropriate date of sale, although depending on the facts of specific review, Commerce may find another date more appropriate.

It is also the case that in instances where a U.S. affiliate warehouses merchandise in the United States and sells from inventory, Commerce only starts the credit expense 'clock' running from the date merchandise is shipped from the U.S. warehouse. Stainless Steel Butt-Weld Pipe Fittings from Taiwan, 63 Fed. Reg. 67,855, 67,856 (Dep't Commerce Dec. 9, 1998)(final results of antidumping duty administrative review).  In such cases, the sale does not occur before merchandise enters the country. Here, on the other hand, Commerce has determined that this is not an instance where merchandise was shipped into the United States before sales were made, and then stored at a warehouse here until they were sold.  Rather, it is more like Brake Drums and Brake Rotors from the People's Republic of China and Stainless Steel Sheet and Strip in Coils from Germany, 64 Fed. Reg. 30,710, 30,733 (Cmt. 12)(Dep't Commerce June 8, 1999)(final determination of sales at less than fair value)(finding that because no warehouses were maintained in the United States and goods were directly shipped to unaffiliated customers, credit expenses, rather than inventory carrying costs for time on the water, were appropriate measure of sales costs

during overseas transit).

Here, as in those cases, Commerce chose to use the date of shipment for the date on which credit expenses would begin to run. But for other calculations in this review, Mittal points out, and Commerce agrees, "Commerce used the invoice date as the date of sale for all of [Mittal's] constructed export price [] sales, even though [Mittal's] merchandise was shipped from Trinidad before [Mittal] issued its invoice." Pl.'s Resp. Ct.'s Feb. 14 Letter 1-2; see D.'s Resp. Ct.'s Letter Feb. 14 & Consent Mot. Partial Voluntary Remand 2 ("D.'s Resp. Ct.'s Letter"). For those other calculations, the government explains that it used the invoice date for date of sale because "the terms of sale . . . often changed from the order date to the invoice date." D.'s Resp. Ct.'s Letter at 2 (quoting Mem. From Magd Zalok to Gary Taverman, CEP Verification of the Sales Resp. In the Antidumping Investigation of Carbon and certain Alloy Steel Wire Rod from Trinidad & Tobago (June 12, 2000)).[14] Commerce chose to use the later date of invoice because it found that in this case, the material terms of sale were not set before the invoice date, despite the fact that goods were

---

[14]This is contrary to the government's earlier arguments regarding credit expenses in its response brief to Plaintiff's motion for judgment on the agency record. There, the government at least implied that the date of sale should be considered to be the date merchandise is shipped to the customer, stating that as of the date of shipment of merchandise, all material terms of a contract are set, and thus the sale has occurred. Def.'s Resp. Pl.'s Mot. J. Agency R. 30-36.

shipped and en route to customers before invoices were issued.  The finding as to date of sale was not challenged by Mittal, nor does the court find it unreasonable.  However, it seems inconsistent for Commerce to then calculate credit expenses beginning on the date of shipment.

Recognizing this, Commerce moves for a voluntary remand, with Mittal's consent.  D.'s Resp. Ct.'s Letter.  In its motion, the government recognizes that "Mittal may not have begun to extend credit at the date of shipment (given its selling practice of invoicing its unaffiliated customers after shipping the merchandise from the foreign port, but not maintaining inventory in the United States)."  Id. at 3.  In response to Commerce's request, the court grants Commerce's motion for remand.  On remand, Commerce may determine the date on which credit expenses should begin to run, keeping in mind its previous determination in this review that the material terms of sale are not set until Mittal issues an invoice.

B.  Carrying Costs

Where the export price is constructed, as here, there are both indirect costs of sale (costs associated with a sale between the two affiliated entities) and direct costs (those costs associated with a sale to an unaffiliated customer).  Commerce "ordinarily do[es] not deduct [from CEP] indirect expenses incurred in selling to the affiliated U.S. importer."  Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 63 Fed. Reg. at 67,856 (Cmt. 2); see also

Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 62 Fed. Reg. 11,825, 11,834 (Dep't Commerce March 13, 1997)(final results of antidumping duty administrative reviews and termination in part); see also Gray Portland Cement and Clinker From Mexico, 62 Fed. Reg. 17,148, 17,168 (Dep't Commerce, April 9, 1997)(final results of antidumping duty administrative review).  Thus, when the affiliated U.S. company receives merchandise shipped from abroad and warehouses it in the United States prior to selling it, the inventory carrying costs for the time in transit from the foreign country to the United States is considered to be an indirect cost, and is not deducted from CEP.  Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 63 Fed. Reg. at 67,856 (Cmt. 2).  Commerce defines inventory carrying costs as "interest expenses incurred . . . between the time the merchandise leaves the production line at the factory to the time the goods are shipped to the first unaffiliated customer." Decisions Mem. at 4 (Cmt. 2).

Here, Mittal reported that merchandise was shipped from Trinidad & Tobago, and upon arrival in the United States, MSNA unloaded the merchandise and arranged for its delivery to unaffiliated customers. Questionnaire Response, P.R. Doc. 16, C.R. Doc. 5 at 24-28.  Nonetheless, MSNA reported inventory carrying costs in the United States.  See Letter to the Honorable Carlos M.

Gutierrez, Secretary of Commerce from Eric Emerson Re: <u>Carbon and Alloy Steel Wire Rod from Trinidad & Tobago: Submission of Case Brief</u>, P.R. Doc. 53, C.R. Doc. 23, 9-10. As noted above, Commerce disagreed and did not permit a reduction of CEP for inventory carrying costs in the United States. Commerce reasoned that once the sale has occurred and the goods are shipped to an unaffiliated customer, credit expenses are the appropriate variable for costs related to sale. This is logical because the merchandise is no longer in inventory. Therefore, Commerce's decision to assess inventory carrying costs only until the goods were shipped from Trinidad & Tobago appears reasonable. Commerce's decision, however, may be affected by its determination of appropriate credit expenses, given its treatment of invoice date as date of sale in this review. On remand, therefore, Commerce may reassess its decision regarding inventory carrying costs in light of its reconsideration of credit expenses.

### Conclusion

For the foregoing reasons, the court **affirms in part and remands in part** Commerce's determinations, and **denies** Plaintiff's Motion for Judgment on the Agency Record.

Remand results are due by June 25, 2007.  Comments are due by July 16, 2007.  Reply comments are due by July 26, 2007.  SO ORDERED.


                                                    /s/ Donald C. Pogue
                                                   Donald C. Pogue, Judge

Dated:      April 24, 2007
            New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____

Deputy Clerk